IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| LACY BARKSDALE, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:13-cv-00036 |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | By:    Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff Lacy Barksdale asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. Barksdale objects to the Administrative Law Judge's ("ALJ") finding that his back pain was a "non-severe impairment," the ALJ's determination of his residual functional capacity, and the ALJ's reliance on the Medical-Vocational Guidelines ("the grids") to effectively direct a finding of "not disabled" in his case. He urges the Court to reverse the Commissioner's decision and to award benefits, or to remand his case for further administrative proceedings.

This Court has authority to decide Barksdale's case under 42 U.S.C. § 405(g), and his case is before me by referral under 28 U.S.C. § 636(b)(1)(B) (ECF No. 14). After reviewing the administrative record, the parties' briefs, and the applicable law, I find that substantial evidence supports the Commissioner's final decision that Barksdale was not disabled. Therefore, I recommend that the Court affirm the Commissioner's final decision.

1

# I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 404.1520(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Barksdale protectively filed for DIB on May 24, 2011, alleging disability beginning April 30, 2011.[1] (R. 61.) He was 59 years old and had worked for many years in the construction industry. (R. 61, 63.) Barksdale said that he could not work anymore because of "Raynaud's disease in [his] hands and feet, inflammation in [his] lower back, and muscle spasms." (R. 61.) A state agency twice denied his application in 2011. (R. 68–69, 78.)

Barksdale appeared with counsel at an administrative hearing on August 16, 2012. (R. 28.) He testified as to his work history, his current symptoms, and the limiting effects of his conditions. (R. 31–56.) No one else testified at Barksdale's hearing. (*See* R. 27.) In a written decision dated September 11, 2012, the ALJ concluded that Barksdale was not entitled to disability benefits. (R. 22, 24–25.)

---

[1] Barksdale also filed for supplemental security income ("SSI"), but there are no documents in the record relating to the SSI claim. (*See* R. 134–38.) Nor does Barksdale's attorney mention the SSI claim in his brief. Thus, the missing records seem to be a non-issue.

3

The ALJ found that Barksdale suffered from severe Raynaud's syndrome[2] but that this impairment did not meet or medically equal any of the impairments listed in the Act's regulations. (R. 19, 21.) He also found that Barksdale's alleged "impairment of lower back inflammation with muscle spasms" (R. 19) did "not even minimally affect [Barksdale's] ability to work, so it [was] a non-severe impairment" (R. 20).

The ALJ next determined that Barksdale had the residual functional capacity ("RFC")[3] to "perform a full range of work at all exertional levels," but must "avoid all exposure to extreme cold." (R. 22.) At step four, the ALJ found that Barksdale could not return to his past work as a construction foreman because his RFC "limits [him] to avoidance of exposure to extreme cold," and "evidence indicates that [his] past work presents exposure to weather condition changes." (R. 24 (citing R. 77).)

At step five, the ALJ used grid Rule 204.00 as a "framework" for finding Barksdale "not disabled" based on his age, education, work history, and ability to perform essentially a full range of unskilled work at any exertion level. (R. 25.) Thus, the ALJ denied Barksdale's application because he found that Barksdale was not disabled between April 30, 2011, and

---

[2] Raynaud's disease is a "primary idiopathic vascular disorder characterized by bilateral attacks of Raynaud's phenomenon." *Dorland's Illustrated Medical Dictionary* 548 (31st ed. 2007). "Raynaud's phenomenon" manifests as "intermittent bilateral ischemia of the fingers, toes, and sometimes ears and nose, with severe pallor and often parasthesia and pain, usually brought on by cold or emotional stimuli and relieved by heat; it is usually due to an underlying disease or anatomical abnormality." *Id.* 1540.

[3] Residual functional capacity, or "RFC," is an applicant's maximum ability to work "on a regular and continuing basis" despite his or her limitations. Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (Jul. 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the applicant's record, 20 C.F.R. § 404.1545(a), and must reflect the "total limiting effects" of the person's impairments and related symptoms, *id.* § 404.1545(e).

4

September 11, 2012. (R. 25.) The Appeals Council declined to review the ALJ's decision on June 13, 2013 (R. 3–4), and this appeal followed.[4]

### III. Discussion

On appeal, Barksdale objects to the ALJ's finding that his back pain was a "non-severe impairment" and that it did not affect his RFC, to the scope of the environmental restriction in the ALJ's final RFC determination, and to the ALJ's reliance on the grids to effectively direct a finding of "not disabled" in his case. (*See generally* Pl. Br. 13–17, 19–21.)

A.    *Relevant Evidence*

1.    *Medical Evidence*

Barksdale sought medical treatment five times between March 2011 and April 2012. On March 18, 2011, Barksdale reported to physician's assistant Debra Cobbeldick that he had experienced back and bilateral hand pain for the past "three to four years." (R. 256.) He explained that he had worked outdoors doing heavy labor for most of his adult life and "that his hands get numb and turn white in the cold." (*Id.*) He also said that his "back muscles tighten up" when he wears his safety harness and that he was "in pain just about every day." (*Id.*)

On exam, Cobbeldick observed poor circulation in Barksdale's right hand and noted that his "hands would turn white when cooled." (*Id.*) She also observed "slight tenderness in the lumbar area" with "intact" range of motion. (*Id.*) A lumbar x-ray showed "good disk [*sic*] space and good space for the nerves and no obvious problems in the back." (*Id.*) Cobbeldick assessed

---

[4] Barksdale also submitted to the Appeals Council a "medical statement from Dr. Paul Buckman dated October 22, 2012." (R. 4.) The Appeals Council found that the ALJ decided Barksdale's case through September 11, 2012, and that "[t]his new information [was] about a later time." (*Id.*) It returned the evidence for Barksdale to use in a new application if he chose to file one. (*See id.*) Barksdale did not submit Dr. Buckman's statement to this Court.

5

low-back strain[5] and recommended that Barksdale treat his pain with heat and Flexeril. (*See id.*) She advised Barksdale that amlodipine, which his family physician had already prescribed, was "the best drug he could take" for Raynaud's disease, but recommended that he add once-daily baby Aspirin. (*Id.*) She also "counseled [Barksdale] on smoking and Raynaud's syndrome that he would do much better if he would quit[;] . . . he was not open to the idea." (*Id.*) Cobbeldick instructed Barksdale to return as needed if his back pain got worse. (*See id.*)

Barksdale visited Volens Family Practice for "back pain" on April 19, 2011. (R. 252.) He specifically denied musculoskeletal stiffness, reduced range of motion, unrelenting pain at rest, numbness, or reduced functional abilities. (*Id.*) He also denied having been diagnosed with inflammatory diseases including osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis. (*See id.*) Barksdale reported that he took Flexeril (cyclobenaprine Hcl), Naprosyn (naproxen), and amlodipine. (*Id.*) Dr. Paul Buckman, M.D., noted that Barksdale's Raynaud's disease was "chronic, not controlled" (R. 254), although he did not note that Barksdale reported any symptoms related to his Raynaud's at this visit (*see* R. 252–54). Dr. Buckman added once-daily diltiazem to Barksdale's amlodipine. (*See* R. 252, 254.)

On exam, Dr. Buckman observed "normal" gait and posture without evidence of scoliosis, but with signs of kyphosis and increased lumbar lordosis. (*Id.*) Barksdale experienced spinous process tenderness, paraspinal muscle tenderness, and paraspinal muscle tightness to palpation. (R. 253.) He also experienced pain rotating, bending laterally, and bending forward. (*See id.*) A straight-leg raising test was normal. (*Id.*) Dr. Buckman assessed "acute, moderate" back pain and administered four units of Kenalog 10mg. (*Id.*) He did not recommend further

---

[5] Contrary to Barksdale's testimony at the August 16, 2012, administrative hearing, the records do not reflect that Cobbeldick suspected that Barksdale had "inflammation" or any "form of arthritis" in his back. (R. 48.)

imaging studies, refer Barksdale to an orthopedic specialist or physical therapist, or suggest that Barksdale treat his back pain with anything besides heat and medication.[6] (*See* R. 252, 254.)

Dr. Catherine Howard, M.D., reviewed Barksdale's medical records for the state agency on July 22, 2011. (*See* R. 64–69.) Dr. Howard found that Barksdale's back pain was a "severe" medically determinable impairment ("MDI"), but she also found that Barksdale's back pain caused no functional limitations. (R. 64–65.) Rather, Dr. Howard opined that Barksdale could work at any exertion level if he "avoid[ed] all exposure" to "extreme cold." (R. 66.)

Barksdale returned to Dr. Buckman's office on July 29, 2011, complaining of fatigue and excessive sleeping. (R. 263.) He did not report any other symptoms at that time, and he was still taking Flexeril, Naprosyn, amlodipine, and diltiazem without reported side effects. (*See* R. 263–66.) On exam, Dr. Buckman observed that Barksdale's gait was "normal" and that he did not experience pain to palpation along the neck, thoracic spine, or lumbar spine. (R. 264.) He did not note any abnormalities such as kyphoscoliosis, scoliosis, lumbar lordosis, or paraspinal muscle tightness. (*See* R. 264.) Dr. Buckman ordered laboratory testing and administered four units of Kenalog for "fatigue."[7] (R. 266.) He instructed Barksdale to follow up as needed. (*See id.*)

Dr. David Williams, M.D., reviewed Barksdale's updated medical records for the state agency on September 1, 2011. (*See* R. 74–78.) Dr. Williams agreed with Dr. Howard that Barksdale's back pain was related to an MDI ("strains and sprains—all types"), but he opined that it was "non-severe." (R. 74.) Dr. Williams considered Barksdale's "history of back strains"

---

[6] Dr. Buckman also prescribed methocarbamol at this visit. (R. 252.) "Methocarbamol is used to relieve the discomfort caused by acute (short-term), painful muscle or bone conditions." The Mayo Clinic, *Methocarbamol (Oral Route)*, http://www.mayoclinic.org/drugs-supplements/methocarbamol-oral-route/description/drg-20071962 (last visited Jul. 17, 2014).

[7] A one-page record from Volens Family Practice dated August 3, 2011, notes that Kenalog was ordered for "back pain" on an unidentified date. (R. 271.) It is not clear whether that order related to treatment from July 29, 2011, or whether Barksdale received another Kenalog injection on August 3, 2011. (*See* R. 252, 266, 277, 280).

7

to be a "temporary" condition because "[a]n x-ray did not show any obvious problems" and Barksdale's July 29, 2011, "physical did not show any objective evidence of continued musculoskeletal issues." (*Id.*) Like Dr. Howard, Dr. Williams opined that Barksdale's back pain caused no functional limitations. (*See* R. 75.) Dr. Williams also agreed that Barksdale could work at any exertion level if he "avoid[ed] all exposure" to "extreme cold." (*Id.*)

Barksdale returned to Dr. Buckman's office on February 3, 2012, complaining of fatigue and weakness. (R. 278.) He also reported that his hands hurt when exposed to cold and that he could not take diltiazem because it "gave [him] chest pain." (*Id.*) Dr. Buckman discontinued diltiazem and added the drug to Barksdale's list of allergies. (*Id.*; *see also* R. 275.) He assessed Barksdale's Raynaud's disease as "acute, moderate" and instructed him to "keep [his] hands warm." (R. 280.)

Barksdale did not report any musculoskeletal discomfort at this visit. (*See* R. 278–80.) On exam, Dr. Buckman observed that Barksdale's gait was "normal" and that he did not experience tenderness to palpation along the neck, thoracic spine, or lumbar spine. (R. 279.) He specifically noted the absence of skeletal abnormalities including kyphoscoliosis and scoliosis. (*Id.*) Dr. Buckman administered four units of Kenalog and instructed Barksdale to "call for any further problems." (R. 280.)

Barksdale returned to Dr. Buckman's office on April 2, 2012, complaining of back pain and requested a "shot." (R. 275.) He explained that he "tried to get up limbs and such and hurt [his] back." (*Id.*) Barksdale reported that he was still taking Naprosyn twice daily "as needed," but that he had "discontinued" Flexeril. (*Id.*) On exam, Dr. Buckman observed that Barksdale's gait was "normal" and that he did not experience tenderness to palpation along the neck, thoracic spine, or lumbar spine. (R. 276.) He again noted the absence of skeletal abnormalities including

8

kyphoscoliosis and scoliosis. (*See id.*) Dr. Buckman assessed "acute, moderate" back pain and administered four units of Kenalog. (R. 277.) He also prescribed a prednisone taper over 15 days. (*Id.*) Barksdale did not report any symptoms related to Raynaud's disease at this visit, but he did express interest in quitting smoking. (*See* R. 275.) At that time, Barksdale reported smoking 10 to 19 cigarettes per day since 1970. (*Id.*)

2.      *The Barksdales' Statements*

Barksdale and his wife, Bonnie Barksdale ("Mrs. Barksdale"), submitted written reports to the state agency in June and August 2011. (*See* R. 186–87, 191–98, 208–15, 217–26.) Barksdale wrote that his hand problems limited his ability to work because he cannot "stay outside" with other workers and cannot "work in cool-cold conditions." (R. 192, 198). Barksdale could function normally "if the temperature [was] warm enough," but his fine-motor skills were compromised in "cool weather [and] damp conditions." (R. 195.) Summertime air conditioning also "sometime[s]" caused pain and numbness in his fingers. (R. 186.)

Barksdale also reported experiencing "aching and throbbing" back pain "most all [the] time" with muscle spasms "up [his] backbone to [his] shoulders." (R. 186.) He said that lifting, bending, twisting, and wearing a safety harness aggravated the pain (R. 186), which necessarily limited his ability to do those things "repeatedly" (R. 196). Medication and rest, on the other hand, made the pain "bearable." (R. 187.) Barksdale did not report any limitations in sitting, standing, walking, or climbing. (R. 196.)

Barksdale and his wife reported that, at least on temperate days, he might "go outside a lot," "take a walk," "chop a little in the garden," "cut the lawn," help make dinner, drive to the store or bank, shop for the family several times per week, go fishing, handle "small" home-repair projects, tend to the family's animals, talk on the phone, and visit his grandchildren. (R. 191,

9

192, 193, 194, 195, 209, 210, 211, 212, 218, 223.) Barksdale reported "no problems" with self-care except when "sometimes [his] hands get sore [and] swollen." (R. 192; *see also* R. 219.) He has trouble buttoning his shirt when that happens. (*See* R. 192, 219.) Barksdale did not describe any changes in his daily activities or hobbies secondary to back pain and muscle spasms. (*See* R. 194–95, 212.)

At the hearing on August 16, 2012, Barksdale testified that P.A. Cobbeldick diagnosed "inflammation which was a form of arthritis" in his back. (R. 48.) He said that this back problem limited his ability to sit, stand, walk, and lift weight. (R. 36.) Barksdale said that he could not lift "much" weight—possibly up to five pounds—because it causes "a problem in [his] back." (R. 36, 54.) He estimated that he could sit for 10 minutes before needing to get up, and that he could walk "maybe" 100 feet before needing to rest. (R. 36–37.) Barksdale testified that he occasionally used his mother's walker, but that no physician had restricted his activities or advised him to use a "device to help [him] get around" on a "permanent, daily basis." (R. 37, 40–41.) He confirmed that he drove a car and cared for himself, but he denied going shopping on a regular basis, doing household chores, working in the garden, mowing the lawn, or taking regular walks. (*See* R. 37–39.)

Barksdale testified that his back pain was "still a big problem" since he stopped working, but that it had not "bothered [him] as bad since [he had] been taking this medication and getting these shots." (R. 48–49.) He described the pain as "catch[ing him] right in the lower part of [his] back . . . just like [when] you take a rag and twist it." (R. 49.) The pain was "moderate," but "bearable" with "shots and pills." (*Id.*) The "severe" pain returned "about two weeks" after each shot. (R. 50.) Barksdale estimated that he had received these shots on three occasions.

10

Barksdale also testified that he left his last job on April 30, 2011, because "they had the air conditioning down to 60 or below and [he] just couldn't stand it." (R. 34.) On cross-examination, Barksdale explained that "every finger" hurts and goes numb in the "air conditioning or any time it's any dampness in the air." (R. 42.) His hands stay numb for "about a hour, hour-and-a-half" once he gets somewhere "with some good heat." (*Id.*) Barksdale explained that his fingers would hurt "all the time" if the temperature were set at 72 degrees, which would limit his ability to write and "pick up stuff." (R. 44, 45.)

B.    *Severe Impairment*

For someone to be disabled, he or she must establish the existence of at least one "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). An MDI is an "impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); *see also Craig v. Chater*, 76 F.3d 585, 592 (4th Cir. 1996) (noting that, while pain caused by an impairment can be disabling, subjective complaints of pain alone that are not supported by objective medical evidence of an impairment are insufficient). The regulations state that an MDI "is *not* severe if it does not significantly limit the [applicant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a) (emphasis added). "Basic" work activities include functions like "walking, standing, sitting, lifting, [and] carrying." 20 C.F.R. § 404.1521(b).

An impairment should be labeled "not severe only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere" with an applicant's ability to work. *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (internal quotation marks omitted); *Waller v. Colvin*, No. 6:12-cv-63, 2014 WL 1208048, at *7 (W.D. Va.

11

Mar. 24, 2014) (citing *Evans*, 734 F.2d at 1014). This is not a difficult hurdle for the applicant to clear. *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 474 n.1 (4th Cir. 1999). Still, this Court must affirm the ALJ's severity finding if he applied the correct legal standard and if his finding is supported by substantial evidence in the record. *See Meyer*, 662 F.3d at 704.

1.    *The ALJ's Severity Finding*

The ALJ acknowledged that Barksdale "alleged an impairment of lower back inflammation with muscle spasms that was exacerbated by lifting and bending and was treated with Flexeril and Naprosyn." (R. 19.) However, he found "that this impairment does not even minimally affect [Barksdale's] ability to work, so it is a non-severe impairment." (R. 20.) The ALJ based that finding on the unremarkable March 2011 lumbar x-ray; "normal" physical exams in July 2011, February 2012, and April 2012; and Barksdale's "adm[ission] that while he used his mother's walker for his back, he was never prescribed any assistive device to aid him in ambulation." (R. 19–20.) He also found that Barksdale's "treatment for his alleged back pain has been minimal with only medication and no injections or surgery being recommended or employed." (R. 20.)

The ALJ also gave "little weight" to Dr. Howard's opinion that Barksdale's back pain was a "severe impairment" because her opinion was "largely based on evidence from before" Barksdale's April 30, 2011, alleged onset date. (R. 19–20.) He gave "great weight" to Dr. Williams's opinion that Barksdale's back pain was a "non-severe impairment" because his opinion was "supported by [Barksdale's] normal exams with no tenderness or gait abnormalities throughout his course of treatment." (R. 20.)

*2.      Analysis*

Barksdale bears the burden of establishing that he has a medical impairment that more than minimally affects his ability to perform basic work activities. It is the ALJ's responsibility to weigh the evidence in Barksdale's record, including the medical evidence, to resolve any conflicts that might appear therein. *See Dunn v. Colvin*, 973 F. Supp. 2d 630, 638 (W.D. Va. 2013) (citing *Hayes v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)). The ALJ in this case found that Barksdale did not carry his burden. (*See* R. 19, 20.) I agree.

Barksdale argues that his "back pain is clearly a severe impairment" because he "has repeatedly indicated that [his] back pain causes him problems in standing, walking, and bending," which are "examples of basic work activities." (Pl. Br. 14 (citing 20 C.F.R. § 404.1521).) Barksdale did report those functional limitations to the agency officials who reviewed his DIB application. (*See* R. 36, 54, 186, 196.) However, he never reported any functional limitations to his healthcare providers. (*See* R. 252–54, 256, 263–66, 275–77, 278–80.) In fact, on April 19, 2011, Barksdale told Dr. Buckman that his back pain did not interfere with his activities of daily living. (*See* R. 252.) Regardless, Barksdale's complaints of pain "will not be found to affect [his] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b). Nor will complaints of pain alone suffice if objective evidence of a medical condition capable of causing pain does not also exist. *See Craig*, 76 F.3d at 592–94.

Barksdale's record contains little, if any, objective medical evidence of even a "slight abnormality," *Evans*, 734 F.2d at 1014, that might be expected to cause his alleged symptoms and limitations. *See* Soc. Sec. R. 96-3p, 1996 WL 374181 at *2 (Jul. 2, 1996) (instructing ALJs to consider the intensity, persistence, and limiting effects of an applicant's symptoms only if the

13

applicant "first establishes by objective medical evidence" the existence of an MDI that "could reasonably be expected to produce the alleged symptoms"). Contrary to Barksdale's testimony, there is no evidence in the record that *any* medical source has assessed "inflammation" or "a form of arthritis" in Barksdale's back. (*See* R. 48, 64, 74, 252–54, 256, 263–66, 275–77, 278–80.) The only known x-ray of Barksdale's lumbar spine, taken in March 2011, "showed good disk [*sic*] space and good space for the nerves and no obvious problems in the back." (R. 256.) Similarly, Barksdale had only one "abnormal" physical exam on April 19, 2011, approximately 10 days before he stopped working in heavy construction. (*See* R. 252.) Dr. Buckman did not recommend further imaging studies, refer Barksdale to an orthopedic specialist or physical therapist, or suggest that Barksdale treat his pain with anything besides heat and medication at that time. (R. 254.)

Barksdale reported to his healthcare providers three times between March 18, 2011, and April 2, 2012, that he experienced back pain. (R. 252, 256, 275.) He lodged two of those complaints while he was still engaged in "very heavy" construction work. (R. 252, 256.) After Barksdale stopped working, Dr. Buckman documented "normal" musculoskeletal exams without any evidence of an underlying abnormality in July 2011, February 2012, and April 2012. (R. 264, 276, 279.) Dr. Buckman reported a normal exam even on the one occasion Barksdale said he hurt his back when he "tried to get up limbs and such." (R. 275.) In determining that Barksdale's back pain was a non-severe impairment, the ALJ cited Dr. Buckman's February and April 2012 treatment notes that documented these normal findings. (R. 19.)

While Dr. Buckman was nonetheless willing to treat Barksdale's alleged pain with corticosteroids,[8] no healthcare provider restricted Barksdale's physical activity, referred him to a

---

[8] Kenalog (triamcindolone injection route) and prednisone are corticosteroids used to treat pain and other symptoms that can be caused by inflammation. *See* The Mayo Clinic, *Tiramcinolone (Injection Route)*,

specialist, or recommended treatment beyond heat, medication, and occasional injections. (*See* R. 37, 50, 252, 264, 276, 279.) Furthermore, Barksdale testified that his back pain had not "bothered [him] as bad since [he had] been taking this medication and getting these shots." (R. 48–49.) Evidence that impairment-related symptoms are controlled with medication can support an ALJ's finding that an underlying MDI is "non-severe." *See Edmunds v. Colvin*, No. 4:12-cv-51, 2013 WL 4451224, at *4 (W.D. Va. Aug. 16, 2013) (citing *Hamilton v. Shalala*, 43 F.3d 1466, at *3 (4th Cir. 1994) (unpublished)).

Barksdale also objects to the ALJ's reliance on Dr. Williams's opinion because that opinion was based on an incomplete record. (*See* Pl. Br. 16–17.) He argues that Dr. Williams did not have access to Dr. Buckman's August 3, 2011, February 3, 2012, and April 2, 2012, treatment notes that "clearly show" Barksdale still suffered from "severe back pain" and received Kenalog injections for relief. (Pl. Br. 16–17.) These records, however, are largely consistent with Dr. Buckman's treatments notes of July 29, 2011, which Dr. Williams did have. Thus, the fact that Dr. Williams did not have these subsequent records does not diminish the weight of his opinion or the ALJ's rationale for crediting it. The ALJ gave specific reasons for accepting Dr. Williams's opinion over this portion of Dr. Howard's opinion (R. 20), and those reasons are supported by substantial evidence in the record. *See Young v. Colvin*, 7:12-cv-468, 2014 WL 991712, at *3 (W.D. Va. Mar. 13, 2014).

Barksdale correctly notes that the ALJ's finding that "no injections . . . [were] recommended or employed" to treat his back pain (R. 20) is factually wrong. (*See* Pl. Br. 17; *see also* R. 252, 277, 280.) Indeed, the ALJ found that Dr. Buckman "administered Kenalog

http://www.mayoclinic.org/drugs-supplements/triamcinolone-injection-route/description/drg-20074674 (last visited Jul. 17, 2014); The Mayo Clinic, *Prednisone (Oral Route)*, http://www.mayoclinic.org/drugs-supplements/prednisone-oral-route/description/drg-20075269 (last visited Jul. 17, 2014).

injections" for "back pain" on April 2, 2012. (R. 19.) But Barksdale does not say how that error could conceivably change the result in his case. *See Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009) (defining the harmless-error standard in social security disability cases). That Barksdale received Kenalog shots every few months falls far short of showing that his complaints of back pain caused even minimal functional restrictions.

The objective medical evidence, and lack thereof, in this record is more than adequate to support the ALJ's finding that Barksdale's back pain was at most a slight abnormality that had a minimal effect on his ability to perform basic work activities. *See, e.g.*, *Bader v. Astrue*, No. 5:09-cv-106, 2010 WL 3783697, at *3 (W.D. Va. Sept. 28, 2010) (affirming ALJ's severity finding where the record did "not include any clinical notations of significant musculoskeletal manifestations," the plaintiff consistently "demonstrated [an] essentially normal gait and range of motion," and the plaintiff's physician "prescribed mild analgesics" but did not refer her to a specialist); *Hunsaker v. Barnhart*, No. 2:05-cv-27, 2005 WL 3271485, at *8 (W.D. Va. Dec. 2, 2005) (affirming ALJ's finding that back pain was a "non-severe impairment" where the available x-ray "showed only mild scoliosis and lumbar spine curvature" and plaintiff "made no other complaints [and] sought no other treatment for back pain").

C.      *Barksdale's Ability to Work*

Barksdale also argues that, because his "severe back impairment" limits him to "light work if not sedentary work," the grids direct a finding of "disabled" based on his age, education, work history, and physical limitations. (Pl. Br. 17, 18 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 202.04, 202.06).) As discussed above, substantial evidence in the record supports the ALJ's finding that Barksdale's alleged back pain is a non-severe impairment that is not expected to

16

interfere with his ability to work. Thus, the remaining question is whether substantial evidence supports the ALJ's final RFC determination.

The ALJ found that Barksdale could "perform a full range of work at all exertional levels" if he "avoid[s] all exposure to extreme cold." (R. 22.) Drs. Howard and Williams both opined that Barksdale's back pain and severe Raynaud's disease imposed no exertional, postural, manipulative, or mental limitations on his ability to work. (*See* R. 66–67, 75–76.) The ALJ gave these opinions "great weight" because he found them to be "consistent with [Barksdale's] limited treatment, non-compliance with recommendations to [stop] smoking, and his lack of signs on physical exam." (R. 24.) No healthcare provider has suggested that Barksdale has any functional limitations, let alone that he is more limited than Dr. Howard, Dr. Williams, and the ALJ ultimately found. (*See* R. 250, 251, 252–54, 256, 263–66, 275–77, 278–80.) Therefore, I conclude that substantial evidence in the record supports the ALJ's finding that Barksdale physically can perform even very heavy work.[9] (R. 22.) *See Fitzgerald v. Astrue*, No. 4:10-cv-17, 2011 WL 1885476, at *4 (W.D. Va. May 18, 2011) (Kiser, J.) ("This Court . . . must affirm if substantial evidence supports the ALJ's decision, even if the Court would have come to a different conclusion . . . .").

Drs. Howard and Williams also opined that Barksdale must "avoid all exposure" to "extreme cold" and "should avoid exposure to cold temperatures" generally. (R. 66–67, 75–76, 77.) Their opinions are consistent with Dr. Buckman's February 2012 recommendation that Barksdale should "keep [his] hands warm." (R. 280.) The ALJ expressly incorporated the "extreme cold" restriction into Barksdale's final RFC. (R. 22.) He also found that Barksdale could not return to his past construction work because his RFC "limits [him] to avoidance of

---

[9] "Very heavy work" involves lifting objects weighing more than 100 pounds at a time and frequently lifting or carrying objects weight 50 pounds or more. 20 C.F.R. § 404.1567(e). Someone who can do "very heavy work . . . can also do heavy, medium, light, and sedentary work." *Id.*

exposure to extreme cold." (R. 24.) Although the ALJ did not define the term "extreme cold," he noted that Barksdale's "past work presents exposure to weather condition changes." (*Id.*) Barksdale objects that the ALJ's final RFC determination does not reflect his "credible" reports that his "hands swell and get numb in not only extreme cold, but in air conditioning and weather in the 60's." (Pl. Br. 20, 21.) Specifically, he argues "that the ALJ committed error by failing to consider all of Plaintiff's impairments from his Raynaud's disease including exposure to air conditioning and environments colder than seventy degrees, and grasping and manipulation limitations." (Pl. Br. 22.)

It is not this Court's role to determine whether Barksdale was a credible witness. *See Craig*, 76 F.3d at 589; *Shively v. Heckler*, 739 F.3d 987, 989 (4th Cir. 1984). Rather, the Court must be satisfied that the ALJ applied the correct legal standard in evaluating Barksdale's credibility and that substantial evidence supports his finding that Barksdale's claims of impairment were less than fully credible. *See Craig*, 76 F.3d at 589; *Dunn*, 973 F. Supp. 2d at 640.

ALJs follow a two-step process for evaluating an applicant's statements about his symptoms, including pain. *See* 20 C.F.R. § 404.1529; Soc. Sec. R. 96-7p, 1996 WL 374186 (Jul. 2, 1996). First, the ALJ must "consider whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce" the applicant's alleged symptoms. Soc. Sec. R. 96-7p, at *2. The existence of objective medical evidence that shows a medical impairment that "could reasonably be expected to produce the pain alleged" is a threshold requirement. *Craig*, 76 F.3d at 594. If such an impairment exists, the ALJ must assess the intensity and persistence of the claimant's pain and the extent to which that pain affects the claimant's ability to work. *Id.* at 595. This assessment requires the ALJ to evaluate the claimant's

credibility and weigh all of the available evidence, including a claimant's subjective statements, medical history, and daily activities. *Id.* (citing 20 C.F.R. § 404.1529(c)(1)–(2)). "Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence." *Id.*

Ultimately, it is the ALJ's job to make findings of fact and to resolve conflicts in the evidence, including the objective medical evidence, in the record. *See Dunn*, 973 F. Supp. 2d at 638 (citing *Hayes*, 907 F.2d at 1456). If the ALJ makes a credibility determination, his reasoning "must be sufficiently specific to make clear" to the claimant and to reviewing courts how and why he weighed the claimant's statements. Soc. Sec. R. 96-7p, at *4; *see also Dunn*, 973 F. Supp. 2d at 639. As long as the ALJ stayed within these bounds, I will not disturb a credibility finding that is supported by substantial evidence in the record. *See Dunn*, 973 F. Supp. 2d at 640.

The ALJ in this case first summarized Barksdale's statements describing the pain and numbness in his hands, unacceptable medication side effects, his weather-dependant daily activities, and his perceived functional limitations. (*See* R. 22–23, 24.) The ALJ also discussed in some detail Barksdale's statements as to how cold temperatures, including air conditioning, allegedly causes his symptoms. (R. 22.) The ALJ then reviewed each of the available medical records relevant to Barksdale's Raynaud's disease. (*See* R. 23.) After reviewing those records, the ALJ found that the Raynaud's disease "could reasonably be expected to cause the alleged symptoms," but that Barksdale's and his wife's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not credible to the extent that they [were] inconsistent" with the ALJ's finding that Barksdale could still work if he "avoid[s] all exposure to extreme cold." (R. 23, 24.)

The ALJ gave several reasons for discrediting Barksdale's complaints of disabling pain and numbness. (*See* R. 22, 23.) For example, he found that Barksdale had "had very little medical treatment, few signs on exam to support his claim of disability, and significant gaps in treatment" for Raynaud's disease or its symptoms. (R. 23.) The ALJ also cited Barksdale's "conflicting statements within the record" and his "non-compliance with treatment, particularly in declining to [stop] smoking and in not taking his prescribed medications." (R. 23, 24.) This evidence "indicates that [Barksdale's] impairment is not as severe as alleged," the ALJ concluded. (R. 23.)

Barksdale argues "that the ALJ committed error by failing to consider all of Plaintiff's impairments from his Raynaud's disease including exposure to air conditioning and environments colder than seventy degrees, and grasping and manipulation limitations." (Pl. Br. 22.) He does not point to any evidence in the record that he believes the ALJ missed, ignored, or misinterpreted in evaluating his credibility. (*See generally* Pl. Br. 19–22.) Rather, he simply asserts that he "testified credibly that his hands swell and get numb in not only extreme cold, but in air conditioning and weather in the 60's"; that he "credibly testified and wrote in his functioning [*sic*] reports that he cannot manipulate his hands because of this"; and that his "wife indicated that she has to help him button his shirts and [that] she tries to buy snap on shirts as an accommodation." (Pl. Br. 20, 21.)

The ALJ expressly considered these very allegations and found them less than credible. (*See* R. 22–24.) The ALJ gave specific and legitimate reasons for discrediting Barksdale's complaints of disabling symptoms, and those reasons are supported by substantial evidence in the record. (R. 23–24, 252–54, 256, 263–66, 275–77.) *See, e.g.*, *Ball v. Colvin*, No. 3:13-6069, 2014 WL 880879, at *9 (S.D. W.Va. Mar. 6, 2014) (finding that the ALJ properly discredited

complaints of disabling Raynaud's symptoms where claimant kept smoking against medical advice); *Mabe v. Colvin*, No. 4:12-cv-52, 2013 WL 6055239, at *7 (W.D. Va. Nov. 15, 2013) (Kiser, J.) (finding that the ALJ properly discredited complaints of chronic pain where there were "numerous" four- and six-month gaps in the claimant's treatment records).

The ALJ also properly evaluated Barksdale's RFC. *See generally Pryor v. Astrue*, 650 F. Supp. 2d 493, 496 (W.D. Va. 2009); 20 C.F.R. §§ 404.1529(c), 404.1545(a)(3). He studied Barksdale's medical records, discussed his unremarkable physical and diagnostic examinations, compared Barksdale's alleged symptoms to his limited and sporadic treatment history, considered Barksdale's conflicting descriptions of his daily activities, noted Barksdale's decision to keep smoking against medical advice, and weighed medical source opinions on Barksdale's functional abilities. (*See* R. 22–24.) The ALJ determined that Barksdale's Raynaud's disease would cause some limitations in the workplace, (*see* R. 19, 22, 24), and he adequately accounted for that impairment by eliminating Barksdale's "exposure to extreme cold" (R. 22). *See Hicks v. Colvin*, No. 7:12-cv-618, 2014 WL 670916, at *7 (W.D. Va. Feb. 20, 2014) (finding that an RFC forbidding "even moderate exposure to extreme cold" accounted for limitations caused by claimant's Raynaud's disease because the "numbness and tingling in her hands . . . results only from exposure to cold temperatures").

D.    *Reliance on the Grids*

Finally, Barksdale argues that the ALJ should have consulted a vocational expert ("VE") regarding his ability to perform work that exists in the national economy rather than relying on the grids to direct a finding of "not disabled." (Pl. Br. 19–21.) Because the ALJ found that Barksdale cannot "perform any past relevant work" (R. 24), the Commissioner bears the burden of proving that Barksdale can perform other work that exists in the national economy. *See*

*Hancock*, 667 F.3d at 472. The Commissioner can meet that burden by calling a VE to testify, 20 C.F.R. § 404.1566(e), or, in "appropriate cases," by relying on the grids to direct a finding of "not disabled," *Heckler v. Campbell*, 461 U.S. 458, 470 (1983).

The grids are published tables that take administrative notice of the number of unskilled jobs at each exertional level in the national economy. *See* 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(a). The grids consider only the exertional, or strength, component of the applicant's RFC. *See Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). They do not take into account mental, postural, or environmental limitations. *See id.* Thus, the Commissioner generally cannot rely on the grids alone when the applicant has a nonexertional impairment. *Aistrop v. Barnhart*, 36 F. App'x 145, 146–47 (4th Cir. 2002) (per curiam); *see also* 20 C.F.R. § 404.1569a. In those cases, the Commissioner must consult a VE to prove that the claimant can perform specific jobs that exist in the national economy. *See Aistrop*, 36 F. App'x at 147; *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983).

That said, "not every malady of a 'nonexertional' nature rises to the level of a 'nonexertional impairment.'" *Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984) (per curiam). Thus, before the ALJ can rely on the grids alone, he must determine "whether a given nonexertional condition affects [the] individual's residual functional capacity to perform work of which he is exertionally capable." *Id.* (citing *Grant*, 699 F.2d at 192); *see also Hairston v. Astrue*, No. 6:11-cv-57, 2013 WL 5151036, at *13 (W.D. Va. Sept. 13, 2013). "If the condition has that effect, it is properly viewed as a 'nonexertional impairment,' thereby precluding reliance on the grids" to resolve the case. *Smith*, 719 F.2d at 725. Whether a condition affects the person's RFC to perform work of which he is exertionally capable is a question of fact that this Court reviews under the substantial evidence standard. *See id.*

22

The ALJ found that Barksdale could perform "a full range of work at all exertional levels" with the additional limitation that he must "avoid all exposure to extreme cold." (R. 22.) Although the ALJ did not define the term "extreme cold," he later found that Barksdale's Raynaud's disease kept him from returning to his past work as a construction foreman because that "work presents exposure to weather condition changes." (R. 24.) In other words, Barksdale's sole impairment-related restriction "affects" his ability to "perform work which he physically can perform." *Hairston*, 2013 WL 5151036, at *13 (citing *Smith*, 719 F.2d at 725).

In some instances that finding would trigger the Commissioner's obligation to "prove by expert vocational testimony" that Barksdale can perform specific jobs in the national economy despite his "nonexertional impairment." *Smith*, 719 F.2d at 725 (citing *Grant*, 699 F.2d at 192); *see also Coffman v. Bowen*, 829 F.2d 514, 519 (4th Cir. 1987) ("[A] mechanical application of the guidelines, where, as here, substantial nonexertional impairments existed, constitute[s] reversible error."); *Long v. Apfel*, No. 98-cv-93, 2000 WL 1469542, at *5 (W.D. Va. Aug. 23, 2000) ("According to the *Smith* test, if nonexertional limitations affect a claimant's residual functional capacity, then the ALJ cannot rely on the grids in order to meet his burden on the fifth step of the sequential inquiry."). Explaining why a finding of "not disabled" was nonetheless "appropriate under the framework" of grid Rule 204.00, the ALJ wrote:

> The claimant's ability to perform work at all exertional levels has been compromised by non-exertional limitations. However, these limitations have little or no effect on the occupational base of unskilled work at all exertional levels. . . . Pursuant to Social Security Ruling 85-15, the claimant's limitation of avoidance of all exposure to extreme cold is a non-exertional restriction that would have little significance in the broad world of work.

(R. 25.) Although the Fourth Circuit has not squarely ruled whether this approach comports with *Smith*, at least one district court in this Circuit allows the Commissioner to use the grids as a

"framework," supported by a Social Security Ruling, in cases where the claimant's nonexertional limitation does affect his ability to perform work of which he is exertionally capable. *See Carey v. Comm'r, Soc. Sec. Admin.*, No. 1:12-cv-3583, 2013 WL 4804734, at *2 (D. Md. Sept. 6, 2013) ("[N]onexertional limitations rise to the level of nonexertional impairments and preclude the use of the [grids] only when the limitations are significant enough to prevent a wide range of gainful employment at the designated [exertion] level." (citing Soc. Sec. R. 85-15)), *aff'd sub nom. Carey v. Colvin*, --- F. A'ppx ---, 2014 WL 3397964, at *1 (4th Cir. Jul. 14, 2014) (per curiam).

Social Security Ruling ("SSR") 85-15 indeed instructs that environmental restrictions, including the need to avoid "extreme" temperatures, "ordinarily would not significantly affect the range of work existing in the national economy for individuals," like Barksdale, who can still perform very heavy work, because most job environments do not expose employees to extreme cold. Soc. Sec. R. 85-15, 1985 WL 56857 at *2, *8 (Jan. 1, 1985) (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 204.00). This ruling directly addresses the environmental limitation in Barksdale's RFC and the effect that it has on the occupational base. *See Allen v. Barnhart*, 417 F.3d 396, 407 (3d Cir. 2005) ("[I]f the [Commissioner] wishes to rely on an SSR as a replacement for a vocational expert, it must be crystal-clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base."). Thus, the ALJ's application of SSR 85-15 was proper in this case.

Barksdale takes issue with the Commissioner's reliance on the grids because he claims that his hands get numb not just in "extreme cold," but also in air conditioning and temperatures in the 60s. (*See* Pl. Br. 20.) This argument again challenges the ALJ's determinations of Barksdale's credibility and RFC, which I addressed above and found are supported by substantial evidence. Barksdale also asserts that "work in an air conditioned environment or an environment

24

in the 60's would eliminate most if not all indoor work." (*Id.*) He cites no evidence in the record or elsewhere for this proposition, and Social Security Ruling 85-15 supports the contrary position, which the ALJ adopted.

The ALJ properly applied the law and relied on substantial evidence in the record in finding that Barksdale's nonexertional limitations caused by Raynaud's disease do not significantly reduce the occupational base. Accordingly, I find that the ALJ's use of the grids as a "framework" was appropriate in this case, and his determination at step five is supported by substantial evidence.

### IV. Conclusion

I must affirm the Commissioner's final decision if the ALJ applied the correct legal standards and if substantial evidence supports his factual findings. I find that both requirements were met in this case. Therefore, I **RECOMMEND** that this Court **DENY** Barksdale's Motion for Summary Judgment (ECF No. 10), **GRANT** the Commissioner's Motion for Summary Judgment (ECF No. 12), **AFFIRM** the Commissioner's final decision, and **STRIKE** this case from the active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk

25

is directed to transmit the record in this matter to the Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: July 23, 2014

Joel C. Hoppe
United States Magistrate Judge